IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ENNIS LEE BROWN,

                Plaintiff,                  OPINION AND ORDER

v.

                                                         19-cv-870-wmc

WISCONSIN DEPARTMENT OF CORRECTIONS,

                Defendants.

---

*Pro se* plaintiff Ennis Lee Brown, a prisoner currently incarcerated at the Wisconsin Secure Program Facility ("WSPF"), filed this proposed action under 42 U.S.C. § 1983, claiming that the Wisconsin Department of Corrections ("DOC") and fourteen DOC employees are violating his constitutional rights. He has requested leave to proceed without prepayment of the filing fee, and he has recently filed a proposed amended complaint (dkt. #12) and statement of imminent danger related to the threat of coronavirus at WSPF (dkt. #13). Because this lawsuit is governed by the Prison Litigation Reform Act, certain conditions must be satisfied before Brown can be extended the privilege of proceeding without paying the filing fee. Relevant here, Brown has already filed at least three previous civil actions while imprisoned that were dismissed as frivolous or for failure to state a claim. *See Brown v. Milwaukee Cty. Jail*, No. 2:15-cv-509-PP, dkt. #29 (W.D. Wis. Mar. 17, 2016) (dismissed without prejudice pursuant to *Heck v. Humphry*, 512 U.S. 477 (1994)); *Brown v. Hicks*, No. 16-1622, dkt. #27 (7th Cir. Feb. 22, 2017) (dismissing Brown's appeal of No. 15-cv-209 as frivolous and noting that his original complaint had been dismissed as frivolous as well); *Brown v. Milwaukee Cty. Pub. Defender*,

No. 16-3182, dkt. #12 (7th Cir. Apr. 20, 2017) (imposing two strikes on Brown because the original action and appeal were both frivolous). Accordingly, Brown may not proceed with his present proposed action without the prepayment of fees under 28 U.S.C. § 1915(g), *unless* he can show that at the time he filed his complaint he was subject to imminent danger of serious physical injury.

After reviewing his complaint, the court concludes that Brown has not alleged facts suggesting that he is in imminent danger of serious physical injury, nor that he was at the time he commenced this action. Accordingly, the court will dismiss this lawsuit without prejudice to Brown's ability to reopen after paying the full $400 filing fee.

ALLEGATIONS OF FACT[1]

**A. Parties**

Plaintiff Ennis Lee Brown currently is incarcerated at WSPF, and he allegedly suffers from Type 2 Diabetes. In addition to the DOC itself, Brown names the following fourteen WSPF employees as defendants: Gary Boughton, Dr. Eileen Gavin, Dr. Jane Doe (an optometrist), Nurse Kinyon, Nurse Practitioner McArdle, Janet Cochran, Dr. Lorenz, Timothy Bromeland, James Bosoim, Ian Malatji, Harry Hanson, Lauren Neuroth, Samantha Brown, and Health Services Unit ("HSU") Manager Adams.

---

[1] The court reads allegations in pro se complaints generously, resolving ambiguities and drawing all reasonable inferences in plaintiff's favor. *Haines v. Kerner*, 404 U.S. 519, 521 (1972).

### B. Brown's Diabetes Diagnosis and Management

On April 24, 2019, Brown had an eye examination with Dr. Jane Doe, and he reported that his vision was blurred at times. Dr. Doe expressed concern that he may have degenerative eye disease and set up an appointment for him to be examined further. Dr. Doe also gave him a prescription for glasses. After Brown received his glasses, he noticed that his vision seemed worse, so he wrote to HSU to have the prescription checked. After re-examining him three months later, Dr. Doe ordered a new prescription, which Brown claims was even worse than the first. Doe then examined him a *third* time, and after noticing that his glucose levels were quite high, she told Brown that those levels could be causing his blurred vision.

In May of 2019, Brown was called to the HSU and met with Dr. Gavin. Brown reported his ongoing vision issues, and he apparently also reported experiencing headaches, hunger, thirst and dry mouth. Brown asked whether his symptoms could be caused by a medication he was taking, but Dr. Gavin responded that she, too, believed his symptoms could be caused by diabetes. Therefore, Gavin directed that Brown's blood be drawn to check his glucose levels, which was done on May 29, 2019. However, by June 15, 2019, Brown still had not received the results of the blood test, so he wrote to the HSU, asking for those results. In response, HSU advised that his provider would review the results of his blood draw during his upcoming appointment.

Brown met with Dr. Gavin again on August 6, 2019, who told him that he had Type 2 Diabetes. Gavin first apologized for the wait and then told Brown that she would order him a medication (Metformin) to be started the next day. After three days passed without

3

receiving his medication, Brown again wrote to HSU, which responded that Gavin had not ordered the medication. On August 11, Brown next wrote to the HSU Manager about needing the medication. Brown received a response from HSU on August 14, 2019, apologizing for the delay, and it appears he started receiving Metformin that same day. Nevertheless, Brown submitted an inmate complaint about the delay in treatment. Brown also continued to request information about his recent diabetes diagnosis, and HSU provided him a pamphlet about diabetes.

On August 20, 2019, Brown was called to the HSU, and while he was waiting to meet with Dr. Gavin, a nurse (apparently "Jane Doe #2") noticed he was sweaty and shaking. She asked to perform a blood sugar test, which revealed a reading of 485, so she immediately talked to Nurse Practitioner McArdle. McArdle then ordered fast acting insulin and injected Brown. HSU staff required Brown to remain in the HSU for another hour before he could return to his job in the kitchen. On August 20, McArdle also issued Brown an Accu-check machine, increased his Metformin dosage, and put him on a regiment of insulin, one fast-acting, which he would take three to four times a day, and the other long-acting, which he would take once a day. Despite those measures, Brown says he still was not educated about how diet and exercise could help control his condition.

Later that same day, August 20, after Brown returned to his cell from work, he checked his blood sugar level, and it was 525 -- five times the average. Correctional Officer Munn called an HSU nurse to examine him. At that point, Nurse Jane Doe #3 confirmed his blood sugar level was 525 and called Nurse Practitioner McArdle again. About 20 minutes later, and apparently at McArdle's instruction, Nurse Doe #3 and CO Munn gave

Brown an insulin shot. After they left, however, no one checked on him, and Brown allegedly did not wake up until the next day.

After that day, Brown continued to seek education about diabetes management from the HSU. He was finally called for an appointment on September 1, 2019, at which time Brown received a new blood sugar chart that listed the units of insulin and when he should take his daily dosages. This chart was different than Brown's previous chart; it instructed him to take his fast-acting insulin if his readings were 100, not 200, as his first chart had directed. This difference caused Brown to take an improper amount of his fast-acting insulin starting September 1, which caused him to fall asleep and wake up shaking and sweating. Brown wrote to HSU about this issue, and he was called back to the HSU on September 18, 2019, at which point Dr. Gavin explained that he was taking a dangerous amount of insulin and acknowledged that whoever provided him the chart on September 1 had violated protocol.

In November of 2019, Brown was seen by a different provider, Dr. Lorenz, who told Brown that his September blood draw level was good. Dr. Lorenz also told him that he (1) should continue taking his 4:00 p.m. injection, and (2) had been getting good readings (less than 100) with the Accu-check. Even though he no longer had blurred vision, Brown claims that he still woke up sweating, shaking and confused, and that he had mood swings. Brown believed that he did not need the daily injections, so he stopped taking them on January 31, 2020. Brown next met with Nurse Practitioner Cochran in February of 2020, who reviewed his blood results from September and allegedly agreed that Brown did not need to continue taking the injections. Cochran also allegedly agreed that Brown should

5

just do one Accu-check in the morning with 1000 mg of Metformin. This apparently prompted Brown to file another inmate complaint related to Dr. Lorenz's injections decision.[2]

On April 1, 2020, Brown was called to the HSU for a Tuberculosis test. Nurse Jane Doe #3 asked Brown if he had night sweats or felt dizzy, and he responded, "not now." Doe #3 also asked him if he had ever been diagnosed with Tuberculosis, and he responded "yes." Doe #3 then checked his blood pressure, and he returned to his unit. On April 2, Brown had a follow-up, tele-visit with Dr. Lorenz, who told him his glucose level was 5, and that he no longer needed to take the injections or use the Accu-check.[3] Dr. Lorenz also reduced his Metformin from 1000 mg daily to 500 mg daily and then ended the tele-visit.

Brown claims that he is now taking Metformin twice a day, but is not exercising or dieting, and he complains that he used to experience low blood sugar levels and kept jelly and juice to raise his levels when they were low. He further claims that he has still not received training about diabetes and has had to turn to other prisoners for help to control his diabetes. In his amended complaint, however, Brown does not allege that this problem is ongoing, nor does he suggest that his diabetes is not under control. Finally, he does not claim to be experiencing any symptoms that HSU staff has been ignoring.

---

[2] Brown also claims that Nurse Kinyon, who was interviewed for purposes of resolving the complaint against Dr. Lorenz, subsequently provided false information suggesting that Brown had refused treatment.

[3] Brown alleges that this blood reading was from March 4, 2020.

### C. Loss of Prison Job

After Brown submitted his inmate complaint about the delays in treatment and lack of education about diabetes, he allegedly started experiencing some problems at his kitchen job. Brown says that he was told he needed to do more of the undesirable tasks, and when he told correctional officers working in the kitchen that he needed to take his medication, he was either told that he could not do so or that he would be fired if he left to do so. For example, on September 4, 2019, when a correctional officer would not allow him to take his medication as scheduled, Brown began feeling sick, and even though he claims his blood sugar level was over 400, the correctional officers refused to let him take his medication. Eventually, while delivering food carts, Brown stopped to take an injection after another inmate worker took his cart for him. However, Brown got caught, which led to an argument between Brown and the correctional officer, and when Brown complained to Food Service Administrator Neutorth about it, he was just told to go back to work.

Later that day, when Brown was in his cell, Correctional Officer Bromeland brought Brown a conduct report for being in an unauthorized area. After telling his side of the story, Brown proceeded to write his version on the conduct report form, but Bromeland told him to erase it because it would not work in his favor. Bromeland also refused to write down Brown's side of the story. On September 5, 2019, Brown was found guilty of being in an unassigned area for going to take his medication, and he received a punishment of five days of cell restriction. That day, Brown saw Warden Boughton and complained about the conduct report, and Boughton told Brown that he could appeal the results of the conduct report to him. Brown complained that Boughton would not be able to review it

in time to avoid him having to serve the punishment, so Boughton told him to file his appeal that night. Although Brown says he submitted his appeal that night, Boughton allegedly still did not review it in time, and Brown ended up serving the entire five-day sentence.

Since then, Brown has continued to have problems working in the kitchen. There was an incident on September 8, 2019, in which he was yelled at while scrubbing kettles. Next, Brown was not allowed to work on September 12, when he received a conduct report for another two infractions, and he was punished with 10 days of cell confinement. Finally, while serving that sentence, Brown lost his job in the kitchen altogether.

###    D.    Brown's Recent Submission Raising COVID-19 Concerns

Most recently, Brown filed a declaration in which he claims that he faces a high risk of death if he contracts COVID-19. (Dkt. #13.) Brown attests that he does not have access to Personal Protection Equipment ("PPE"), and he cannot maintain social distancing or take any action to protect himself. Brown further attests that he is not aware of any other WSPF prisoners testing positive or coronavirus or showing flu-like symptoms.

## OPINION

Brown claims that defendants have violated his civil rights, and it appears that he believes that he lost his prison job out of retaliation for filing inmate complaints about the delay he experienced in obtaining diabetic treatment and medication, as well as educational materials/guidance on managing his diabetes. To meet the imminent danger threshold that

8

plaintiff must clear as a result of previously filing three frivolous actions under 28 U.S.C. § 1915(g), however, each of his claims must support an inference that Brown is in "imminent danger of serious physical injury." 28 U.S.C. § 1915(g). This imminent danger exception is intended to provide "frequent filer" inmates -- otherwise subject to the three strikes rule -- "an escape hatch for genuine emergencies," where "time is pressing" and "a threat . . . is real and proximate." *Heimermann v. Litscher*, 337 F.3d 781 (7th Cir. 2003). Accordingly, allegations of past harm do not suffice; the harm must be imminent or occurring at the time the complaint is filed. *See Ciarpaglini v. Saini*, 352 F.3d 328, 330 (7th Cir. 2003); *Lewis v. Sullivan*, 279 F.3d 526, 531 (7th Cir. 2002).

Unfortunately for Brown, all of his allegations refer to instances of past harm. Brown filed his original complaint on October 23, 2019, and his amended complaint on April 22, 2020. Even construing Brown's allegations broadly, the court does not have sufficient information to infer that Brown was in imminent danger of serious physical injury on October 23, 2019. Indeed, according to his amended complaint, Brown had already met with Dr. Gavin by that point in time to address his recent lethargy, and Dr. Gavin corrected the mistake that an HSU staff member had made about when he should take his fast-acting insulin. Critically, what Brown does *not* allege in either his original complaint or amended complaint is that, as of October 23, 2019, his glucose levels were not being monitored or controlled, nor did he report symptoms suggesting that to be the case. Rather, his concern was that *if* a problem with his diabetes arose, he was not confident WSPF staff would handle it appropriately. Brown's speculation that a problem would arise

and be handled inappropriately was not enough to establish imminent danger of serious physical harm on October 23, 2019.

To be fair, in his amended complaint, the treatment of Brown's diabetes remained inconsistent, as did his sugar and insulin levels, at least until January of 2020. Of particular concern, Brown alleges in his amended complaint that Dr. Lorenz's November 2019 decision to have him continue with fast-acting insulin injections led both to increased lethargy and his unilateral decision in January 2020 to stop taking those injections as prescribed. These events might permit an inference that Brown continued having problems managing his diabetes at the time he filed his original complaint, but Brown's allegations in his amended complaint related to his *ongoing* symptoms are too vague to permit that same inference and certainly not an inference that Brown is at risk of serious physical harm. Indeed, Brown has not alleged that any of his glucose levels have been out of normal ranges since January 2020, and his most recent allegations do not indicate that he currently is dealing with symptoms suggesting that he might be at risk of any other serious physical injury (such as a recurrence of vision problems, headaches, or dizziness), nor that HSU staff are ignoring his concerns. If that is not the case, Brown may submit an amended complaint that provides further details about his most recent glucose levels and other symptoms, as well as how WSPF staff are responding to his requests to treatment.

Finally, Brown's concerns about his potential exposure to the coronavirus, as well as his concern about his vulnerability if he contracts COVID-19, are understandable, but his concerns were not raised in his original or amended complaint, and they are not properly before the court as a part of this lawsuit. In any event, the court cannot conclude

that he is in imminent danger of serious physical injury from the coronavirus based on his allegations to date. To start, Brown's assertions in his declaration are very brief and do not provide a clear picture of his health or whether he is currently unable to follow the institution's social distancing guidelines. Moreover, the Wisconsin Department of Corrections has provided publicly available information about the testing of DOC staff and prisoners over the DOC's websites. Those websites show that two WSPF prisoners have been tested for the coronavirus so far -- one test came back negative and the other is currently pending -- and that no WSPF staff members have been tested for the virus.[4] Accordingly, based on Brown's limited representations about his individual circumstances and the publicly available information about the incidence of coronavirus at WSPF currently, there is no basis to find that Brown currently faces an excessive risk of serious physical harm due to the coronavirus.

That said, if the circumstances at WSPF change, and Brown believes that the manner in which WSPF staff are responding to the risk of coronavirus spread within the institution constitutes deliberate indifference or otherwise implicates his constitutional rights, he may be able to pursue a separate lawsuit and satisfy the imminent danger requirement. To pursue that lawsuit, Brown will need to first exhaust the administrative remedies available to him within the institution, and failing that, provide specific details in a new lawsuit as to (1) why he is personally at high risk if exposed to the coronavirus, and (2) how WSPF staff have failed to take proper precautions to protect him from

---

[4] https://doc.wi.gov/Pages/COVID19%28Coronavirus%29/COVID19TestingDashboard.aspx; https://doc.wi.gov/Pages/COVID19%28Coronavirus%29/EmployeeConfirmedCases/COVID19EmployeeConfirmedCases.aspx (last visited May 13, 2020).

11

exposure to the coronavirus. Of course, that complaint will again be subject to review under § 1915(g), and even if granted leave to proceed *in forma pauperis*, he will be required to pay an initial partial filing fee to pursue that lawsuit. For purposes of *this* lawsuit, however, Brown will be denied leave to proceed *in forma pauperis*, unless he submits an amended complaint indicating that his is having ongoing problems controlling his diabetes that have put him in imminent danger of serious physical harm.

ORDER

IT IS ORDERED that:

(1) Plaintiff Ennis Lee Brown is DENIED leave to proceed *in forma* under 28 U.S.C. § 1915(g).

(2) This case is DISMISSED without prejudice to plaintiff's ability to reopen it if: (a) he submits a proposed amended complaint providing further details about whether he is at current risk of serious physical injury; or (b) he pays the full $400 filing fee by **June 4, 2020**.

Entered this 14th day of May, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge